UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO 18-10172-RWZ

CAPITAL FINANCE, LLC, et al.

v.

22 MAPLE STREET, LLC, et al.

MEMORANDUM OF DECISION

March 9, 2018

ZOBEL, S.D.J.

Plaintiff-lenders Capital Finance, LLC and Capital Funding, LLC move for appointment of a receiver of "owner" defendant-borrowers 22 Maple Street, LLC; 25 Oriol Drive, LLC; 59 Coolidge Road, LLC; and 20 Kinmonth Road, LLC (the "Owner Defendants") and "operator" defendant-borrowers Waban Health Center, LLC; Merrimack Valley Health Center, LLC; Watertown Health Center, LLC; and Worcester Health Center, LLC (the "Operator Defendants"). Defendants own and operate skilled nursing facilities at their Massachusetts properties. Though all defendants are distinct corporate entities, each is controlled and managed by non-party Synergy Health Centers, LLC ("Synergy"). See Docket # 1-2 at 88, 89.

On January 16, 2018, plaintiffs filed a complaint in the Business Litigation Session of the Suffolk Superior Court alleging defendants had breached their loan agreements and seeking appointment of a receiver of the properties and nursing home operations. Defendants subsequently removed the action to this court. After briefing

the receivership motion but the day before this court's scheduled hearing, each Owner Defendant filed a petition for bankruptcy under Chapter 11 in the Eastern District of New York. That stayed this litigation with respect to the Owner Defendants. See 11 U.S.C. § 362(a). Since the Operator Defendants did not file for bankruptcy, plaintiff Capital Finance LLC's motion for appointment of a receiver of their businesses is properly before this court.[1]

I. **Factual Background**

Following are the facts as set forth in the pleadings and the parties' submissions to the pending motion.

A. **The Loan and Forbearance Agreements; Breach Thereof**

On March 4, 2014, Capital Funding, LLC and other non-party lenders provided a $36,856,627 mortgage loan to Owner Defendants for the purchase of four Massachusetts properties. Shortly thereafter, on March 28, 2014, Capital Finance, LLC and other non-party lenders provided a $7,500,000 revolving credit "AR Loan" to the Operator Defendants, who have a combined total of over 500 beds at their respective nursing facilities on the four properties.[2] The Mortgage Loan is secured by the properties and the AR Loan is secured by all of the Operator Defendants' assets, which include all accounts and other personal property. Plaintiffs have perfected these interests and hold first priority to them over other creditors.

Plaintiffs allege that Owner and Operator Defendants defaulted on their loan

---

[1] Hereinafter, "plaintiff" refers to Capital Finance, LLC and "defendants" refers to the Operator Defendants.

[2] The AR Loan originally provided up to $7,500,000 to fund the operation of the facilities, but was later limited to $4,000,000.

obligations just over a year after entering into the contracts. The parties thereafter entered into a set of First Forbearance Agreements, which were later allegedly breached, and a set of Second Forbearance Agreements, which were also allegedly breached. As of January 2, 2018, $31,110,090.97 was due on the mortgage loan and, as of January 5, 2018, $2,669,060.90 was due on the AR Loan.[3] Both amounts are exclusive of interest, fees, and other charges that continue to accrue.

### B. Operator Defendants' Financial Picture

Beyond the Operator Defendants' defaults under the AR Loan and Forbearance Agreements, plaintiff alleges that "Defendants are not paying their debts and do not have the funds to pay their debts." Docket # 25 at 6. The situation will continue to deteriorate, plaintiff says, because "Operator Defendants' monthly revenues have been less than their operating expenses for at least the last year." Docket # 32 at 2. Philip Moylan, a Director at Capital Finance, LLC, examined defendants' balance sheets and income statements and calculated that their 2017 operating expenses were $4,410,542 greater than their total revenues. See Docket ## 32-1 ¶ 6; 32-2 at 1.

Plaintiff further alleges that defendants' financial problems threaten the continued operation of the defendants' nursing homes and, by extension, the viability of the assets securing the AR Loan. By Administrative Bulletin 18-03, the Commonwealth of Massachusetts Executive Office of Health and Human Services ("EEOHS") has

---

[3] Defendants state that they made further payments subsequent to plaintiff's complaint such that, as of February 6, 2018, the total balance on the AR Loan was $1,953,374.66. See Docket # 22-1 ¶ 9. They also state that additional payments of $307,471.47 were made as of February 8, 2018. Id. Those statements are disputed, however, by the sworn affidavit of Capital Finance, LLC Director Philip Moylan, which contends that "over $2.7 million is outstanding [on the AR Loan] as of the end of day Feb 15, 2018." Docket # 32-1.

warned that nursing facilities with unpaid bed taxes (also called "user fees") may be referred to the Department of Public Health for license revocation. See Docket # 25-1 at 3. Furthermore, by letter dated January 26, 2018, EOHHS specifically notified defendants Worcester Health Center and Watertown Health Center that, given their outstanding user fees totaling $434,453 and $367,240, respectively, EEOHS would begin to offset MassHealth payments to the centers by 15% to begin recouping the outstanding debts. See Docket # 25-2 at 2, 5. In addition, defendants' management company Next Step has threatened to cease providing services because of defendants' failure to timely pay them. Docket ## 1-1 ¶ 51; 1-6 at 6-17. Other vendors are similarly dissatisfied. For example, plaintiff's Managing Director, Glen Dywer, submitted a sworn affidavit stating that, on February 9, 2018, he learned that the regular HVAC service provider for the Waban Health Center had refused to come fix problems with the heating system, apparently because defendants owed money to the company. Docket # 25-3 ¶ 9. Finally, plaintiff alleges that "Defendants do not have a decision maker in charge and running their operations, instead they are experiencing management deadlock, which further threatens any viability of their operations." Docket # 25 at 3. In support, Mr. Dwyer stated that while one Zisha Lipschutz historically held himself out as the main contact and decision maker for defendants, Mr. Dwyer was informed on February 9, 2018 that Mr. Lipschutz no longer has decision-making authority. Docket # 25-3 ¶¶ 11, 13.

Defendants generally dispute the severity of the financial deficiencies alleged by plaintiff. According to defendants, they are "consistently" making payments "without any issue" on the outstanding Massachusetts bed taxes and the management fees

owed to Next Step. Docket # 22 at 7. Though they concede that the outstanding bed taxes amount to $1,166,953.75 across the four facilities, defendants say they are "making monthly payments in response to these charges on a consistent and continuing basis" and note that the Commonwealth has not yet initiated procedures to revoke their licenses.[4] Docket 22-1 ¶ 5. With respect to the AR Loan itself, defendants argue that the balance is being "automatically paid down whenever Synergy collects on accounts receivables," including payments as recent as February 8, 2018. Docket # 22 at 7.

## II. Legal Standard

"This Court has inherent equitable power to appoint a receiver to manage or preserve property pending judgment." U.S. Bank Nat'l Ass'n v. Pendleton Westbrook SPE, LLC, No. 2:16-CV-00411, 2016 WL 6808141, at *3 (D. Me. Nov. 17, 2016) (citing United States v. Quintana-Aguayo, 235 F.3d 682, 686 & n.8 (1st Cir. 2000)). Receivership is an extraordinary remedy, justified only when a clear showing is made that an "emergency exists, in order to protect the interests of the plaintiff in the property." Commodity Futures Trading Comm. v. Comvest Trading Corp., 481 F.Supp. 438, 441 (D. Mass. 1979). To warrant the appointment of a receiver to manage and operate a business, "there must be at the least a 'sufficient showing' of something more than the inadequacy of the security and the doubtful financial standing of the debtor." Chase Manhattan Bank, N. A. v. Turabo Shopping Ctr., Inc., 683 F.2d 25, 26 (1st Cir. 1982) (quoting Garden Homes, Inc. v. United States, 200 F.2d 299, 301 (1st Cir. 1952)). In determining the presence vel non of "something more," courts look to factors

---

[4] Mr. Moylan's affidavit and the supporting documents filed therewith estimate the total outstanding bed taxes to be $2,418,101 inclusive of interest. Docket ## 32-1 ¶ 11; 32-6 at 1.

5

such as "fraudulent conduct on the part of the defendant; imminent danger that property would be lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and the plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property." Id. at 26-27. Ultimately, "the decision to appoint a receiver clearly lies within the discretion of the court." Consol. Rail Corp. v. Fore River Ry. Co., 861 F.2d 322, 326 (1st Cir. 1988).

## III. Discussion

Plaintiff argues that a receiver is necessary because "[d]efendants' careless and negligent behavior has not only jeopardized the Agent's Collateral, but it has put the residents at their nursing facilities at risk." Docket # 17 at 2. In addition to being in default on their loan obligations, plaintiff contends that defendants are unable to keep up with payments to vendors such that there exists a real and alarming threat that the facilities will falter and all revenues will cease. Plaintiff also suggests that a receivership is in the public interest, given the threat to patients if the nursing homes fail. Finally, plaintiff notes that a separate Massachusetts nursing facility affiliated with Synergy is already in receivership.

Defendants counter that although they are in default on their obligations to plaintiff and do have certain outstanding balances with vendors, appointment of a receiver is unnecessary because "Plaintiffs present no allegations or evidence to demonstrate that the Defendants are insolvent and provide the Court with no showing whatsoever that the Properties provide inadequate security to satisfy the total debt

owed." Docket # 22 at 6. They argue that their financial position is not as grim as plaintiff claims and that, in any event, plaintiff has failed to show the requisite "something more" which would justify receivership.

Contrary to defendants' arguments, I am persuaded that receivership is fully warranted. This conclusion is based on the complaint; the parties' briefs, affidavits, and related papers; the loan agreements; and supplemental financial information regarding defendants' accounts receivable and payable; as well as the parties' arguments at the hearing on plaintiff's motion.[5]

To begin, "plaintiff's probable success in the action" is considerable. See Turabo, 683 F.2d at 27. Breach of the loan and forbearance agreements is not seriously in dispute, nor is the fact that the entire AR Loan balance is presently due and owing. That defendants "continue to perform on and pay the loans" is immaterial because, as they admit, the alleged breaches concern "certain reporting requirements, covenants and agreements" which they failed to satisfy. Docket # 22 at 6, 7.

Turning to the "possibility of irreparable injury to [plaintiff's] interest in the property," it is clear that the viability of defendants' operations is seriously threatened because their current income stream is insufficient to cover their operating expenses and outstanding debts. For example, defendants' 2017 revenue was $39,028,687 and their operating expenses were $43,439,228. Docket ## 32-1 ¶ 6; 32-2 at 1. Consistent with this pattern of negative net income, over half of defendants' current accounts payable are 90 days past due. Docket ## 32-1 ¶ 8; 32-4 at 1. Because vendors are

---

[5] Because equity justifies a receivership here, the court need not consider any separate contractual grounds.

likely to cease providing services if these debts are not paid, and because the Commonwealth may revoke defendants' licenses if the bed tax debt isn't remedied, the continued operation of the nursing facilities is at risk.

While defendants present financial data purporting to show that "the existing receivables ... are sufficient to cover all vendor payables," Docket # 33 at 2, their proffer is highly misleading for several reasons. First, the data excludes several large debts, including the outstanding Massachusetts bed taxes and large (though disputed) fees owed to Woodmark Pharmacy. When those debts are included, the conclusion that defendants are insolvent becomes inescapable.[6] Second, defendants provide no information on the certainty of collecting the purported receivables, which is doubtful because (i) Massachusetts has threatened to withhold a portion of MassHealth payments to offset the overdue bed taxes; and (ii), in any event, the AR Loan agreement requires that all of defendants' collections be paid to a lock box and used to repay the outstanding loan debt before any other payables. Defendants acknowledge that the AR Loan is "automatically paid down whenever Synergy collects on accounts receivables," Docket # 22 at 7, but fail to address how this situation impacts their ability to pay vendors. Notably, plaintiffs are not prepared to forbear exercising this right or to lend additional funds (though they would extend credit to a receiver) and defendants have not identified any other source of funding. Defendants' contention that "[a]ny threat of the nonpayment of vendors is extinguished by the uncontroverted fact that upon receipt of each facility's receivables, all vendors will be adequately and

---

[6] It is also unclear whether defendants' data accounts for any fees or interest being charged by vendors due to the various delinquencies.

satisfactorily paid" is therefore disingenuous and irreconcilable with the evidence. Docket # 33 at 3.

Finally, while the Operator Defendants are separate legal entities from the Owner Defendants, the latters' recent bankruptcies further underscore the gravity of defendants' financial problems given that both sets of companies are owned and managed by Synergy. The bankruptcies and surrounding facts also lend credence to plaintiff's allegations of gridlock and disarray within Synergy's management. For instance, defendants submitted an affidavit of Zisha Lipschutz dated February 9, 2018 in which he described himself as "Manager for Synergy Health Centers." Docket # 22-1 at 2. That same day, however, plaintiff was informed that Mr. Lipschutz no longer has decision-making authority for the organization. Furthermore, while defendants cited the Lipschutz affidavit on February 12, 2018 and contended that "Synergy...will continue [to] make payments without any issue" on the mortgage loan, Docket # 22 at 7, the Owner Defendants filed for bankruptcy just two days later. Bankruptcy filings and a new affidavit in this case list one Y.C. Rubin as defendants' "Chief Restructuring Officer" and do not mention Mr. Lipschutz. Such management disarray further supports appointment of a receiver to operate the nursing homes.

In sum, defendants' financial situation is "something more" than "doubtful"—it is dire. See Turabo, 683 F.2d at 26. I am persuaded that there is an "imminent danger" that the relevant property, i.e. the accounts and other assets securing plaintiff's loan, will be "lost" or "diminished in value." See id. at 26-27. These circumstances, when considered alongside plaintiff's probable success in the underlying action as well as Synergy's management turmoil and the bankruptcy of the Owner Defendants, justify a

receivership. Moreover, the court is mindful that defendants operate skilled nursing homes with hundreds of patients. Operational mishaps, service interruptions, and license revocations may well affect the health and safety of patient-residents. That fundamentally distinguishes this case from those involving, for instance, commercial office buildings, see U.S. Bank Nat. Assoc. v. DePietri, Sr., No. 10-cv-10920, 2010 WL 3259979 (D. Mass. Aug. 18, 2010), or media businesses, see Alta Subordinated Debt Partners II, L.P. v. Tele-Media Co. of the Carolinas, No. 95-cv-11105, 1995 WL 464925 (D. Mass. July 26, 1995).

## IV. Conclusion

Plaintiff Capital Finance, LLC's Emergency Motion for Appointment of Receiver is ALLOWED as to Waban Health Center, LLC, Merrimack Valley Health Center, LLC, Watertown Health Center, LLC, and Worcester Health Center, LLC.

The parties shall confer and, within seven days from the date of this Memorandum of Decision, submit to the court a Joint Proposed Order Appointing Receiver that is specific to this case and these defendants.

| | |
|---|---|
| __March 9, 2018__ | _/s/ Rya W. Zobel_ |
| DATE | RYA W. ZOBEL |
| | SENIOR UNITED STATES DISTRICT JUDGE |